# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 18-CR-00728 |
| v. | |
| ROMEO BLACKMAN, TERRANCE SMITH, JOLICIOUS TURMAN, and NATHANIEL MCELROY | Judge John Robert Blakey |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

On January 24, 2018, the Special Grand Jury returned a superseding indictment against Defendants Romeo Blackman, Terrance Smith, Jolicious Turman, and Nathaniel McElroy. [56]. Count One of the indictment charges all four Defendants with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO); Counts Two through Eleven charge Defendants Blackman and Smith with numerous related crimes, including firearm violations, and murder and attempted murder in aid of racketeering; and Count Twelve charges Defendant Turman with murder in aid of racketeering.

This matter comes before the Court on Defendants Blackman's and Turman's motions to suppress. For the reasons explained below, this Court: (1) denies Defendant Turman's motion to suppress statements elicited by the Government's jailhouse informant, [284]; (2) denies Defendant Blackman's motion to suppress statements made to a cooperating individual, [248]; (3) denies Defendant Turman's motions to suppress all evidence relating to an August 3, 2016 traffic stop, [282]; (4) denies Defendant Turman's motions to suppress statements made to law enforcement on August 3, 2016, [286]; and (5) grants in part Defendant Turman's motion to suppress suggestive identifications, [289].

I.   **Defendant Turman's Motion to Suppress Statements Elicited by the Government's Jailhouse Informant, [284]**

The superseding indictment charges Defendant Jolicious Turman with participating in the RICO conspiracy (Count One) and with one VICAR offense—the murder of Ramal Hicks (Count Twelve). [56]. As part of the RICO conspiracy charge, the Government alleges that Defendant Turman committed the murder of Kenneth Whittaker. In preparation for trial, Defendant Turman filed several motions to suppress. The Court first addresses Defendant Turman's motion to suppress statements elicited by the Government's jailhouse informant, [284]. The parties agreed that no evidentiary hearing was necessary to resolve this motion, and thus the Court relies upon the parties' stipulated facts and draws reasonable inferences therefrom, [323].

A.   **Findings of Fact**

On August 3, 2016, law enforcement arrested Defendant Turman for possession of ammunition without a valid FOID card. Shortly thereafter, Turman was charged in Cook County with a Class A misdemeanor weapons offense and remanded to the custody of the Cook County Department of Corrections pursuant to both the weapons offense and an unrelated attempted burglary charge for which he was on electronic monitoring at the time of his arrest. [323] ¶ 3. Turman was represented by counsel in both pending cases.

On or about September 27, 2016, the state dismissed Turman's Class A misdemeanor charge; three days later, he was charged with the felony offense of unlawful possession of a weapon by a felon, also arising out of the August 3, 2016 incident. *Id.* ¶¶ 4–5. He remained in the custody of Cook County. *Id.* ¶ 5.

Several months later, on or about February 8, 2017, the Chicago Police Department ("CPD") applied for and obtained an Order for Use of an Eavesdropping Device in the Circuit Court of Cook County. *Id.* ¶ 6. CPD did so as part of a joint state and federal investigation. *Id.* During this time, Turman also remained under investigation for the murder of Kenneth Whittaker. *Id.* ¶ 12. No charges had yet arisen. *Id.*

The affidavit submitted in support of the eavesdropping order relied, in part, upon information from a confidential source ("CS") who had purportedly communicated with Defendant Turman several times through a vent between cells in the facility. The CS recounted that during one conversation, Defendant Turman stated that he "killed someone near a school on Morgan Street a few hours after Robert Vaughn was killed, in retaliation for Vaughn's murder." *Id.* ¶ 7.

The eavesdropping application affidavit also contained information regarding Defendant Turman's arrest on August 3, 2016, and a subsequent interview of Defendant Turman by state and federal officers. *Id.* ¶ 8. During that interview, which took place at the Cook County Jail on September 9, 2016, Defendant Turman's attorney was not present.[1] *Id.*

Based upon the affidavit, the Cook County Circuit Court judge issued the eavesdropping order, finding "reasonable cause" to believe that Defendant Turman and others committed murder and that conversations concerning the murder would be obtained through the eavesdropping device. *See* [285].[2]

Pursuant to the court order, the CS recorded conversations with Defendant Turman on or about February 9, 2017. [323] ¶ 10. The recording is partially inaudible, *see* [325], but the Government seeks to introduce a part of the conversation—that it argues is sufficiently audible—about the murder of Kenneth Whittaker at trial.[3]

## B.    Conclusion of Law

Defendant Turman seeks to suppress the recorded conversation about the Whittaker murder pursuant to the Sixth Amendment. [284]. The Government counters that its use of the confidential informant complied with the Sixth Amendment because the questioning did not relate to any currently pending charges against Defendant Turman. [310].

The Sixth Amendment protects the right to an attorney in all criminal prosecutions. U.S. Const. amend. VI. Once the Government initiates the adversarial process, the Sixth Amendment "guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citing *United States v. Wade*, 388 U.S. 218, 227–28 (1967)). Conversely, Sixth Amendment rights do not attach regarding conduct for which adversarial proceedings have not yet commenced.

Interrogation of a charged defendant constitutes a critical stage. *Massiah v. United States*, 377 U.S. 201, 204–05 (1964). Absent a valid waiver of the right to

---

[1] The Government represents that it will not seek to introduce any evidence from this interview, and in reliance, Defendant Turman does not seek to litigate any issues arising from it. *See* [267] at 1.

[2] Defense counsel emphasizes, and the Government acknowledges, that there is no record of whether law enforcement instructed to CS to avoid discussing Defendant Turman's pending cases. As discussed herein, however, neither party has identified any portion of the recording relevant to those charges. Whether law enforcement gave the CS such an instruction is not material to the outcome here.

[3] Defendant Turman's pending motion in limine 3, [383] at 5, challenges the admissibility of the recording on inaudibility grounds. That motion remains under advisement.

counsel, law enforcement cannot question the charged defendant about the crime without his attorney present. *See Montejo*, 556 U.S. at 786. Law enforcement also cannot circumvent that right by deliberately eliciting incriminating statements through a confidential informant. *See Massiah,* 377 U.S. at 206 ("We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel."); *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).

The Sixth Amendment, however, does not prohibit *all* uncounseled communication with a charged defendant. *See Texas v. Cobb,* 532 U.S. 162, 173 (2001). As the Supreme Court has stated, "police have an interest… in investigating new or additional crimes" after an individual is formally charged with one crime, and to "exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities…" *McNeil v. Wisconsin*, 501 U.S. 171, 175–76 (1991) (citing *Maine v. Moulton*, 474 U.S. 159, 179–80 (1985) (alterations in original)). Thus, the Sixth Amendment right to counsel is offense specific. *McNeil*, 501 U.S. at 175 ("The Sixth Amendment right… cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced."). When the Sixth Amendment right to counsel attaches, it attaches to a charged offense and includes other offenses that, "even if not formally charged, would be considered the same offense under the *Blockburger* test." *See Cobb,* 532 U.S. at 173, 178–79 (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

The *Blockburger* test states that for an uncharged offense to qualify as the "same offense" as the charged offense, the offenses must arise from the same act or transaction and have the same elements. *Id.* at 173. Courts compare the elements of the two offenses in the abstract. The offense only qualifies as "the same" for the purposes of the Sixth Amendment if the elements are the same, or if one offense is a lesser-included offense of the other. 532 U.S. 162 (2001).

The Supreme Court elaborated upon this analytical process in *Texas v. Cobb*, wherein it explicitly rejected the practice some lower courts had employed of evaluating the factual relatedness of offenses and reiterated the role of the *Blockburger* elements test. *Cobb*, 532 U.S. at 173.

Here, the Government seeks to introduce portions of Turman's conversation with the CI about the murder of Kenneth Whittaker. At the time, Defendant Turman faced no charges regarding the murder, and so his Sixth Amendment right to counsel had not attached as to it. The pending ammunition charges and the uncharged murder of Whittaker (now charged as a RICO predicate objective in Count One) plainly constitute distinct offenses under *Blockburger*. Namely, they do not share the

same elements nor is one a lesser included offense of the other. Given the offense-specific nature of the Sixth Amendment, the recorded conversation did not, then, violate Defendant Turman's Sixth Amendment right to counsel.

Nonetheless, Defendant Turman asks the Court to abandon the requisite *Blockburger* test and consider instead the relationship between the ammunition offenses with which he had been charged and the other crimes about which the CI questioned him. He argues that ammunition offenses were part and parcel of a broader racketeering conspiracy for which he was being investigated and therefore, that the Sixth Amendment right that attached to the ammunition offenses ought to extend beyond the formal pending charges and shield him from uncounseled questioning regarding the uncharged racketeering investigation.

The facts of *Cobb* illustrate just how intentionally limited the *Blockburger* test is and the uphill battle a defendant faces to establish it. There a mother and child went missing from a home that had been burgled. The defendant was charged with the burglary but faced no charges related to the missing residents. Later, however, following a third-party tip, the defendant confessed to law enforcement—without his attorney retained for the burglary charges—that he killed the mother and child during the course of the burglary. The lower courts held that his Sixth Amendment right tied to the burglary also attached to the murders because the crimes were "closely related factually." *Cobb,* 532 U.S. at 162. The Supreme Court reversed, finding that the burglary and murders did not share the same elements pursuant to the *Blockburger* element tests and the Sixth Amendment right to counsel does not extend to crimes that "are 'factually related' to those that have been charged." *Id.* at 166. Notably, in so holding, it emphasized that *McNeil* "meant what it said": the "the Sixth Amendment right is 'offense specific,'" *id.* at 162.

In arguing that the context of a RICO conspiracy charge ought to create some sort of exception to *Cobb*, Turman relies upon three cases, probing ambiguities he believes they raise about the applicability of the *Blockburger* analysis to this case. He cites *United States v. Krueger*, in which the Seventh Circuit considered the Sixth Amendment right to counsel when state charges and federal charges factually overlap. 415 F.3d 766 (7th Cir. 2005). There, Krueger faced state law charges for trafficking in marijuana, but the state dropped the charges when federal authorities announced they intended to prosecute Krueger for a related federal offense. *Id.* at 768. In the federal case, Krueger moved to suppress uncounseled statements he made after he was transferred from state to federal custody, but before federal charges had been formally filed. The *Krueger* Court grappled with whether the state and federal offenses constituted the "same offense" under the Sixth Amendment. *Id.* For double jeopardy purposes—the area of law from which the *Blockburger* test arises—identical offenses charged by different sovereigns, even when arising from the very same factual incident and legal elements, do not offend the Constitution. *See* [314]. The Seventh Circuit pondered how the dual sovereignty issue might impact the Sixth

Amendment right to counsel analysis, but it ultimately resolved the case on other grounds and thus left—according to Turman—an open question (albeit no precedential basis to ignore *Cobb*).

Next, Turman cites *United States Red Bird*, 287 F.3d 709 (8th Cir. 2002) and *United States v. Mills*, 412 F.3d 325 (2d Cir. 2005)—both cases *Krueger* discusses in detail. In *Red Bird*, the Eighth Circuit found that the Sixth Amendment "precluded a federal agent from initiating an interview with the defendant about a possible federal charge when the defendant had already been charged with essentially the same crime in tribal court." *Krueger*, 415 F.3d at 776 (citing *Red Bird*, 287 F.3d at 715). In reaching its conclusion, the Eighth Circuit highlighted that: the tribal charge had triggered the federal inquiry; tribal authorities had "worked in tandem" with the FBI to investigate the same crime; the two offenses had nearly identical elements; and tribal sovereignty is unique and limited, particularly in relationship with federal sovereignty.[4] *Id.*

Similarly, in *Mills,* the Second Circuit rejected "the contention that dual sovereignty doctrine renders overlapping federal and state charges distinct for Sixth Amendment purposes." *Id.* at 777 (citing *Mills*, 412 F.3d at 329). *Mills* noted that the Supreme Court has not explicitly incorporated the concept of dual sovereignty into the Sixth Amendment context, and found that where "the same conduct supports a federal or a state prosecution, a dual sovereignty exception would permit one sovereign to question a defendant whose right to counsel had attached, to do so in the absence of counsel and then to share the information with the other sovereign without fear of suppression." *Id.* The *Mills* Court rejected that result.

Clearly, Turman has identified a grey area in the law. *See Turner v. United States*, 885 F.3d 949 (6th Cir. 2018) (describing an ongoing circuit split as to the dual sovereignty question). But the circuit split cannot save his motion to suppress here. That is, even though he faced state charges regarding the ammunition offense at the time of the recorded conversation and now faces federal racketeering charges, that does not change the fundamental matter that *Cobb* and *Blockburger* still require that Defendant Turman establish that the ammunition offense was the "same offense" as the offenses charged here. Turman reads *Mills* and *Red Bird* to stand for a proposition beyond dual sovereignty: that the Sixth Amendment "does not promote law enforcement gamesmanship in the interrogation of represented defendants." *Id.* at 4. The Court does not find this reading persuasive, for as noted above, the offenses here remain distinct regardless of dual sovereignty, and the Supreme Court has clearly recognized law enforcement's compelling public interest "in investigating new or additional crimes." *McNeil*, 501 U.S. at 175–76.

---

[4] The Court notes that *Red Bird* is no longer good law. *United States v. Bryant*, 579 U.S. 140 (2016) (holding that the Sixth Amendment right to counsel does not apply to tribal court proceedings in the first instance).

Quite simply, Turman cannot establish that the Sixth Amendment right to counsel attached for any of the charges he now faces. To the contrary, applying the *Blockburger* and *Cobb* test, the charges here remain distinct from the ammunition offense. Indeed, it is well established that under *Blockburger*, a RICO conspiracy is a separate crime from the various predicates which make it up. *See United States v. Garcia*, 754 F.3d 460, 474 (7th Cir. 2014) (addressing this issue in the double jeopardy context); *United States v. Morgano*, 39 F.3d 1358, 1367 (7th Cir. 1994) (same).[5] As such, crimes that constitute part of a broader, later-charged conspiracy do not create an umbrella right to counsel for all later-charged crimes involved in the conspiracy. *See, e.g. United States v. Merritt*, No. 07–550–04, 2013 WL 124947 (E.D. Pa. Jan. 8, 2013) (finding that a gun possession charge which serves as a RICO predicate is a distinct offense from the RICO conspiracy for purposes of the Sixth Amendment right to counsel).

For this reason, the facts of Turman's case are not parallel to those of *Krueger*, *Red Bird*, and *Mills*. Turman's argument functionally relies upon the "factual relationship" standard that the Supreme Court plainly rejected in *Cobb*. Turman's argument is thus foreclosed.

In addition to his Sixth Amendment arguments, Defendant Turman' also argues, in a single line of his brief, that "the Fifth Amendment's Due Process Clause mandates fundamental fairness." [284] at 6–7. Defendant cites no law to suggest that the Government's use of confidential informants, where compliant with the Sixth Amendment, constitutes a due process violation. The Court rejects this undeveloped argument as waived. *See Butler*, 58 F.4th at 368.

For the reasons explained, this Court denies Defendant Turman's motion to suppress [284].

## II. Defendant Blackman's Motion to Suppress Statements Made to a Cooperating Individual, [248]

Defendant Blackman moves to suppress the recorded statements he made on December 14, 2016 to an individual cooperating with law enforcement. [248]. Defendant Blackman alleges that law enforcement recorded his conversation with the cooperating individual ("CI") in violation of his rights under the Fifth and Sixth Amendments, *Miranda v. Arizona*, 384 U.S. 436 (1966), and Illinois law, and thus should be excluded at trial. [284].

The parties agreed that no evidentiary hearing was necessary and submitted certain stipulated facts ("Joint Ex. A" and "Stipulation 1") and an agreed draft

---

[5] Of course, the ammunition offense is not even charged as a predicate offense here: rather, the conduct constituting that charge simply provides a factual portion of the Government's evidence underlying the RICO conspiracy.

transcript of the conversation (hereinafter "Joint Ex. B"). The parties' motions also attach two exhibits without objection that provide further factual background: [248-1] (LaSalle County docket) and [266-1] (eavesdropping application and authorization).

The Court sets forth below the relevant facts and draws the resulting conclusions of law. To do so, the Court makes factual findings and draws reasonable inferences based upon the undisputed evidence the parties submitted; and issues its legal conclusions after reviewing the parties' briefs, [248], [266], [293], [317], and [320] and argument from the parties on February 24, 2023, [312].

### A.    Findings of Fact

As relevant here, three distinct circumstances gave rise to investigations and charges against Defendant Blackman. On December 14, 2016, the day of Defendant Blackman's recorded conversation with the CI, Defendant Blackman was: (1) in custody awaiting trial on charges he faced in LaSalle County; (2) under investigation by the Chicago Police Department for the murder of Andre Donner; and (3) under investigation for a gun store burglary in Streator, Illinois. The Court briefly summarizes the status of each case, as it stood on December 14, 2016.

First: the LaSalle County case. Defendant Blackman faced the following charges in LaSalle County: (1) unlawful possession of a controlled substance with intent to deliver; (2) unlawful possession of a stolen firearm; (3) unlawful possession of a weapon by a felon; and (4) armed violence. [248] at 4; [248-1]. The LaSalle County docket confirms that these charges arose from an incident on August 5, 2016, and that at all relevant times, Defendant Blackman was represented by counsel in the LaSalle County case. [248-1] at 1–2; [266] at 3. The Government further notes that with respect to the LaSalle County, Defendant Blackman "was arrested in a bedroom after a search warrant in possession of a controlled substance and a firearm." [266] at 6.

Second: the murder of Andre Donner. Andre Donner had been murdered almost exactly a year before the December 14, 2016 conversation and law enforcement suspected Defendant Blackman's involvement. [248] at 9. While Blackman did not yet face formal charges in December 2016, law enforcement had initially questioned him about Donner's murder shortly after it happened. *Id.* During the questioning, Defendant Blackman told a CPD detective that he wanted a lawyer, and thus, the interview was terminated. *Id.*

Third: the Streater, Illinois gun store burglary. Following a June 20, 2016 gun store burglary in Streater, Illinois, two individuals identified Blackman, implicating him in both the burglary and resulting possession of stolen firearms. [266-1] at 5–8. As of December 2016, Blackman did not yet face charges related to the burglary

incident. The parties stipulated that the factual predicates for Defendant Blackman's August 2016 LaSalle County charges, and the offenses tied to the gun store burglary, are "not part of the same act or transaction." *See* Stipulation 1.

The day before the December 14, 2016 recorded conversation, law enforcement transported Defendant Blackman from the LaSalle County facility in which he was held to a police station in Chicago. [248] 3–4. In the transport van, Blackman and the CI—known to Blackman merely as a fellow inmate—spoke to each other. [266] at 3; [248] at 7. Blackman shared that "he is a member of the Black Disciples street gang from Englewood," that "he frequently visits Streator, Illinois, and that while in Streator, Blackman would steal guns and bring them back to the hood." [248] at 4–5; [266] at 3; [266-1] at 9.

Once at the station, a CPD evidence technician took Defendant Blackman's palm print as part of its investigation into the Donner murder. [248] at 8 n. 6.[6] Also at the station, the CI told law enforcement about his conversation with Blackman on the drive to the city. [266] at 3; [248] at 4. Based upon the CI's information and previously gathered evidence, law enforcement determined that probable cause existed "to believe that Blackman had been engaged in a gun store burglary out of Streator, Illinois, and that the guns were in Chicago in the possession of other members of the Gangster Disciples street gang in Englewood." [266] at 3. *See* [266-1] at 5–9. The CI and law enforcement also believed Defendant Blackman would likely engage in further conversation with the CI on the return trip. [248] at 5.

The next day, Chicago Police Officer Joseph Chausse filed an eavesdropping application in Cook County Circuit Court. [266-1] at 3–4. Based upon the application, the judge found the requisite cause "to believe that conversations related to the listed offenses would be overheard" and authorized various members of the

---

[6] Defendant Blackman suggests in briefing that he may have invoked his right to counsel at or near this time, citing a passing remark he made to the CI in the later recorded conversation: "so every time I'm lock up they come and snatch me up they ain't going to scare me shit jut now but I already know what it's for though I told them call my lawyer shit. [Unintelligible] shit hit my lawyer just man…" [248] at 10; Joint Ex. B at 5. While this brief comment suggests Blackman may have invoked his right to counsel often, it remains insufficient, without more, to establish that Blackman, in fact, invoked the right on any particular occasion. Among other factors, the plain language of the remark indicates that the phrase "every time" refers to CPD's common practice of interviewing Blackman whenever he was taken into custody ("so every time I'm lock up they come and snatch me up"), rather than referring to any blanket invocation by Blackman on every occasion (*i.e.*, Blackman states, "I told them call my lawyer" not "I always tell them to call my lawyer" or other words to that effect). No other evidence in the record suggests that Defendant Blackman invoked his right to counsel on the date of the recorded conversation or in the days or weeks leading up to that time; nor is there any reason to believe he would have done so in response to the mere taking of a palm print or in response to a conversation with a fellow inmate he did not know was a CI. Indeed, in support of his motion, Blackman could have sought to present evidence of an invocation (if true), but he chose, as is his right, not to present any evidence. Given the factual record, this Court cannot, and does not, find that Blackman invoked his right to counsel during the relevant series of events.

Chicago Police Department, Cook County State's Attorney's Office, and FBI to overhear Blackman's conversations with the CI. [266-1] at 1.

Later that day, law enforcement placed Defendant Blackman in a transit van to return him to LaSalle County, again accompanied by the CI. [266] at 4. This time, a recording device in the van documented the conversation. *Id.* Blackman spoke to the CI about "murders, stealing firearms, and being known as the 'Reaper' in the streets of Englewood." *Id.*; Joint Ex. B.[7] Throughout the conversation, the CI asked Blackman a variety of questions, including questions about the Donner murder. *See* Joint Ex. B. Defendant Blackman now asks the Court to suppress this conversation.

## B.     Conclusions of Law

The Fifth and Sixth Amendments guarantee a criminal defendant's right to counsel in distinct circumstances. The Fifth Amendment right to counsel applies during custodial interrogation, but the Sixth Amendment right to counsel attaches only after adversarial judicial proceedings commence—*i.e.*, when the defendant is charged with a crime. *See Davis v. United States*, 512 U.S. 452, 456–62 (1994). Defendant Blackman seeks suppression under both amendments. *See* [248] at 6–12.

### 1.     No Violation of the Sixth Amendment Right to Counsel

First, Defendant Blackman asserts that because his Sixth Amendment right to counsel had attached regarding the LaSalle County charges at the time of the recorded conversation, the Court must suppress the recording in this case. [248] at 6–8.[8]

As explained in the context of Defendant Turman's motion above, the right to counsel attaches at the commencement of adversarial judicial proceedings and is offense specific. *See supra* § I(B). If law enforcement interrogates or otherwise deliberately elicits incriminating remarks "pertaining to pending charges," those remarks "are inadmissible at the trial of those charges." *Moulton*, 474 U.S. at 180. But even after the right to counsel has attached pursuant to one offense, law enforcement remains free to question a defendant regarding the subject matter of other, uncharged offenses. *See id.* ("[T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time,

---

[7] Blackman also briefly spoke about the charges he faced in LaSalle County. [266] at 4 n. 2. The Government represents that it will not seek to introduce these portions of the conversation at trial, *see id.*, which moots the motion as to those statements.

[8] The Government seeks to admit portions of the recorded conversation that concern the alleged gun store burglary and murders that formed the basis of the eavesdropping order, but not the portion of the recording related to the LaSalle County charges, *see* [266] at 4 n.2. The Court thus has no occasion to rule on the admissibility of that portion of the conversation in this case.

would unnecessarily frustrate the public's interest in the investigation of criminal activities").

At the time of the recorded conversation, Defendant Blackman faced a single set of pending charges: the LaSalle County charges. Thus, at the time of the recorded conversation in this case, Defendant Blackman's Sixth Amendment right to counsel had attached as to the LaSalle County charges. Defendant Blackman did not yet face charges, however, as to the Donner murder or the gun store burglary.

As noted in the context of Defendant Turman's motion above, the Sixth Amendment right to counsel on a charged offense only extends to other uncharged offenses if the uncharged offenses qualify as "the same offense" under the "same elements" test set forth in *Blockburger* and *Cobb*. Defendant Blackman makes no attempt to argue that the Donner murder or the gun store burglary could be considered, in any sense, the "same offense" as the LaSalle County charges. Defendant provides no basis to find that Defendant Blackman's Sixth Amendment right to counsel had attached to the Donner murder or the gun store burglary. Thus, the Sixth Amendment provides no reason to suppress the recordings in this case.[9]

### 2. No Violation of the Fifth Amendment Right to Counsel

Next, Defendant Blackman argues that the Fifth Amendment compels suppression of the recording. Specifically, he argues that because he had long ago invoked his right to counsel as to the Donner murder, law enforcement could not use a confidential informant to question him regarding that murder. Defendant Blackman thus suggests that questioning him (a year after his invocation) by means of the CI constitutes an "end run" around his Fifth Amendment right to counsel. [248] at 12.

The Fifth Amendment protects a criminal defendant's right against self-incrimination. The Fifth Amendment "right to counsel" originates not from the Constitution directly but rather from the "prophylactic rule" established by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Edwards v. Arizona*, 451 U.S. 477 (1981) to protect the right against self-incrimination. *See Vega v. Tekoh*, 142 S. Ct. 2095, 2101 (2022). This instrumental rule is designed to prevent officers from badgering a suspect into confessing in the inherently coercive environment of custodial interrogation. *See Maryland v. Shatzer*, 559 U.S. 98, 105 (2010). The Fifth Amendment right to counsel applies only in that limited context.

---

[9] Finding the Sixth Amendment right to counsel inapplicable as to the evidence the Government seeks to admit, this Court need not reach the question of whether the CI may have deliberately elicited statements from Defendant Blackman or, alternatively, served as a mere listening post. *See* [248] at 10; [266] at 7; [293] at 3 (setting forth the parties' positions).

When an individual invokes his Fifth Amendment right to counsel, all questioning must cease—no matter the subject. *See id.* at 124 n. 8 (citing *Arizona v. Roberson*, 486 U.S. 675, 684 (1988)). Unlike the Sixth Amendment right to counsel, the Fifth Amendment right is not "offense specific." Upon invocation, the *Edwards* presumption attaches: any subsequent waiver of the right to counsel is presumed involuntary unless or until "the accused himself reinitiates further communication, exchanges, or conversations with the police," or a 14-day break in *Miranda* custody occurs, at which point the officers become free to reinitiate. *Shatzer*, 559 U.S.. at 104–05, 110 (citing *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)).

Much of the case law since *Miranda* addresses the definition of "custodial interrogation" and whether certain boundary cases fall within its scope. The question presented here is whether questioning by a confidential informant constitutes custodial interrogation when: (1) the defendant is incarcerated; and (2) invoked his right to counsel one year earlier.

Defendant Blackman argues that he was subjected to custodial interrogation and that his prior invocation of the right to counsel precludes the Government from introducing his statements to the CI at trial.[10] [248] at 8–12. The Government disagrees, countering that *Miranda* protections only extend "to those who are interrogated, while in custody, by persons they know are acting on behalf of the government." [266] at 7. The Government argues that, because Defendant Blackman admits that he remained unaware of the CI's connection to law enforcement at the time of the conversation, [248] at 7, his conversation with the CI cannot be characterized as "custodial interrogation." [266] at 7. For the reasons explained below, the Court agrees with the Government.

In *Hoffa v. United States*, the Supreme Court held that questioning by a government informant did not qualify as custodial interrogation under the Fifth Amendment because the defendant remained unaware of the informant's true role and thus the scenario did not create the kind of inherently coercive atmosphere *Miranda* seeks to address. 385 U.S. 293 (1966).

The defendant in *Hoffa* was not incarcerated at the time of the conversation, however, and so following *Hoffa*, it remained an open question whether and how

---

[10] In his initial motion, Defendant cited *Stubbs*, 944 F.3d at 828, and *United States v. Micheltree*, 940 F.2d 1329 (10th Cir. 1991) for the proposition that courts have extended the Fifth Amendment's right to counsel to any questioning by government informants. [293] at 5. But these cases stand for no such thing. In *Stubbs*, the Eleventh Circuit found that "conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." 944 F.2d at 832 (citing *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). Instead, the *Stubbs* court found that the defendant's Sixth Amendment—not Fifth Amendment—right to counsel was violated because the jailhouse informant questioned the Defendant after her Sixth Amendment right to counsel had attached. *Id.* at 833. Similarly, *Micheltree* also held that use of an informant violated the defendant's Sixth Amendment—not Fifth Amendment—right to counsel. 940 F.2d at 1335.

incarceration may impact the Fifth Amendment inquiry. In other words, when, if ever, would the Fifth Amendment prohibit an undercover agent or confidential informant interrogating an incarcerated defendant?

The Supreme Court's decision in *Illinois v. Perkins*, 496 U.S. 292 (1990) answered this question. There, an "undercover government agent was placed in the cell of Perkins, who was incarcerated on charges unrelated to the subject of the agent's investigation." *Id.* at 294. Perkins sought to suppress statements he made to the agent pursuant to the Fifth Amendment because the agent did not give him *Miranda* warnings. *Id.* The Supreme Court held that the interrogation did not violate Perkin's Fifth Amendment rights. It rejected "the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent." *Id.* at 297. Instead, it held, *Miranda* rests upon the premise "that the danger of coercion results from the interaction of custody and official interrogation," so if "the suspect does not know that he is speaking to a government agent there is no reason to assume the possibility that the suspect might feel coerced." *Id.* at 297, 299. In other words, the *Miranda* prophylactic rule seeks to mitigate the coercive, "police-dominated atmosphere" of custodial interrogations, of which there is no risk where the suspect remains unaware of the CI's law enforcement affiliation. *Id.* at 296–97.

*Perkins* resolves the issue presented here in the Government's favor. Defendant Blackman was in custody, but he did not face interrogation by a known government actor. Defendant Blackman nonetheless seeks to distinguish *Perkins*, arguing that he had invoked his right to counsel prior to questioning by the CI. The Seventh Circuit has not directly addressed this issue, and Defendant has identified no current case law—binding or otherwise—to compel a different result based on a prior invocation a year before questioning. He points only to the later-overruled state appellate court decision which addressed *Perkins* upon remand from the United States Supreme Court. *See People v. Perkins*, 618 N.E.2d 1275 (Ill. App. Ct. 1993) ("*Perkins II*"). There, an Illinois court found that Perkins had invoked his right to counsel prior to questioning and, based upon that distinction, found that the Supreme Court's holding no longer governed. *Id.*

If *Perkins II* offered a viable reading of the Supreme Court's decision, it would indeed support Defendant Blackman's theory, but this is not the case. As the Illinois Supreme Court later observed:

> *Perkins II* totally disregarded the fact that, in *Perkins I*, the United States Supreme Court had already determined that "an undercover law enforcement officer posing as a fellow inmate need not give Miranda warnings to an incarcerated suspect before asking questions that may elicit an incriminating response." Implicit in this holding is that

> questioning by an undercover law enforcement officer posing as a fellow inmate is not an "interrogation" under *Miranda*."

*People v. Hunt*, 969 N.E.2d 819, 825 (Ill. 2012) (quoting *Perkins I*, 496 U.S. at 300) (expressly overruling *Perkins II*). While nonbinding, this Court finds the Illinois Supreme Court's reading of the question persuasive, and consistent with the Supreme Court's own ruling in *Perkins*, as well as the holdings of two circuits that have addressed the issue.[11] *See United States v. Cook*, 599 F.3d 1208 (10th Cir. 2010) (finding prior invocation irrelevant); *United States v. Stubbs*, 944 F.2d 828, 832 (11th Cir. 1991) (same). *But see United States v. Holness*, 706 F.3d 579 (4th Cir. 2013) (deeming this an open question). In this Court's view, the reasoning of *Perkins* remains clear: where the inherently coercive dynamics of law enforcement interrogation are absent, questioning by a confidential informant or undercover does not constitute custodial interrogation, and thus cannot violate *Miranda* or the Fifth Amendment right against self-incrimination.[12] Thus, the Fifth Amendment does not compel suppression here.

### 3. No Violations of Illinois Law or Ethical Rules

Finally, Defendant Blackman argues that law enforcement violated various Illinois rules. First, he argues they violated Illinois Rule of Professional Conduct 4.2, which states: "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer

---

[11] Justice Brennan's concurring opinion in *Perkins* did comment, in a footnote, that he believed the Court's analysis would be different if Mr. Perkins had previously invoked his right to counsel or right to silence. *Perkins*, 496 U.S. at 300 n.*. As courts have since observed, however, Justice Brennan's observation remains inconsistent with the majority's explicit finding that the interrogation did not implicate the Fifth Amendment right against self-incrimination in the first instance because it was not a custodial interrogation. *See* Wayne R. LaFave et al, *Criminal Procedure* (4th ed. Nov. 2022), § 6.7(c) ("While a concurring opinion in *Perkins* asserted that if 'respondent had invoked either [his right to remain silent or his right to counsel], the inquiry would focus on whether he subsequently waived the particular right,' that contention is inconsistent with the analysis of the *Perkins* majority, and lower courts have thus 'applied Perkins even if a suspect had previously invoked both the right to remain silent and the right to counsel.'") (quoting *Perkins*, 496 U.S. at 300 n.* (Brennan, J., concurring) and *State v. Hall*, 65 P.3d 90, 100 (Ariz. 2003)). In short, the majority's ruling controls.

[12] As the Government correctly notes, the *Edwards* presumption of involuntariness has no bearing upon this case since the Supreme Court held in *Maryland v. Shatzer* that the presumption expires after a 14-day break in *Miranda* custody. 559 U.S. 98, 110 (2010). As *Shatzer* noted, a release to the general population of a prison constitutes a break in custody for *Miranda* purposes. *Id.* at 114. Nonetheless, while *Shatzer* gives law enforcement the right to reapproach a defendant and seek a waiver of the right to counsel after 14 days, it does not authorize uncounseled custodial interrogation absent waiver. Therefore, resolution of the Fifth Amendment issue here thus turns, as described above, not upon the issue of invocation, but rather upon whether Blackman's conversation with the CI constituted custodial interrogation.

or is authorized to do so by law or a court order." While Defendant Blackman cites this ethical rule for the broader premise that "no lawyers (such as the ASAs) shall have contact with a represented party," [248] at 8, the rule explicitly states that it only applies to communication about the subject of the representation. Thus, as with his Sixth Amendment arguments, Blackman's Rule 4.2 argument reaches only the LaSalle County charges—about which the Government does not seek to introduce Blackman's statements. *See People v. Santiago*, 925 N.E.2d 1122, 1130 (Ill. 2010) (interpreting the term "matter" in Rule 4.2 to refer from a "case perspective" rather than a "fact" perspective). Any issue raised by those statements is thus moot.

Defendant Blackman also lists several Illinois statutes under which "the defense submits that the recording may be subject to suppression," pending further discovery. [248] at 12–13. Blackman fails, however, to develop these other arguments (or even mention them in reply), thus waiving any additional grounds for suppression. *See United States v. Butler*, 58 F.4th 364 (7th Cir. 2023) (holding that a party waives perfunctory or undeveloped arguments).

In conclusion, for the reasons explained, this Court denies Defendant Blackman's motion to suppress his December 14, 2015 statements made to the confidential informant, [248].

### III. Defendant Turman's Motion to Suppress All Evidence Relating to the August 3, 2016 Traffic Stop, [282]

The Court next turns to Defendant Turman's motion to suppress all evidence relating to the August 3, 2016 traffic stop. [282]. On March 13, 2023, this Court held an evidentiary hearing regarding this motion and Defendant's motion to suppress statements made to law enforcement during the stop, [286]. [344]. The same factual circumstances give rise to both motions, and thus the Court makes one consolidated set of factual findings.

During the hearing, the Government presented testimony from two CPD officers, Ivan Passamentt and Michael Vainisi, and an additional eyewitness, Breana King. *See* [344]. Defendant Turman presented the testimony of his sister, Shaneisha Turman.[13] *Id.* The parties also introduced factual stipulations, documentation, and

---

[13] Based upon the in-court proceedings, this Court makes the factual finding that the CPD officers testified credibly. *United States v. Thurman*, 889 F.3d 356, 366 (7th Cir. 2018) (Generally, the trial court's credibility determinations are entitled to deference "because, unlike our review of transcripts, the district court 'had the opportunity to listen to testimony and observe the demeanor of witnesses at the suppression hearing.'" (quoting *United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007) and *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006)). At the evidentiary hearing, the parties' stipulated facts, as well as the material portions of the contemporaneous police report, corroborated both officers' testimony. Moreover, portions of Breana King's testimony also confirm the officers' accounts, and, to the degree she offered diverging testimony, it did little to cast doubt upon the officer's

a map. *See* [324] (factual stipulations); [283-1] (case incident report); [283-2] (arrest report); [283-3] (traffic citation record); Gov. Ex. A (map); Gov. Ex. B (toolbox); Gov. Ex. C (photograph of toolbox); Gov. Ex. D (same).

Based upon this record, which includes the materials submitted by the parties and the evidence presented at the hearing, this Court makes its factual findings and draws the resulting conclusions of law.

## A.    Findings of Fact

On August 3, 2016, at approximately 10:26 p.m., two Chicago Police Department tactical team officers—Ivan Passament and Michael Vainisi—patrolled Englewood.  [324] ¶ 1; [344] at 6, 48.  At the time, the area was part of a "priority enforcement zone" designated for proactive policing due to the prevalence of violence, including gang conflicts.  [344] at 6–7; [283-1] at 4.  Multiple "shots fired" calls had been reported that night.  [344] at 29.

The officers, travelling in an unmarked car, noticed a red Pontiac.[14]  Both officers observed that the vehicle's rear license plate was not illuminated.  [344] at 10–11, 48–49; [283-1] at 4.  From approximately twenty feet behind the car, the officers were unable to read the characters on the license plate in the dark.  [344] at 10–11, 48–49.  Aware that Chicago Municipal Code requires plates to be visible from a 50-foot following distance, the officers conferred for a few seconds, and decided to conduct a traffic stop.  [344] at 11.

Breana King, a resident of South Bishop Street, drove the red Pontiac that evening, and Defendant Jolicious Turman sat in the back seat on the passenger side. [344] at 15, 70; [283-1] at 4.[15]  Ms. King testified that Defendant Turman had asked Ms. King for a ride that night to a local supermarket.  Years later, she cannot recall the route she drove, but she remembers being pulled over on Bishop Street by a police

---

testimony given her lack of specific recollection.  The testimony of Defendant Turman's sister, Shaneisha Turman, did contradict the officers' testimony in some respects, but Ms. Turman's testimony stood largely contradicted by the other three witnesses, and her limited observations and peripheral involvement in the stop undermine her credibility.  Based upon the entire record, this Court does not credit Shaneisha Turman's testimony regarding the location, timing, or relevant events of the stop, and otherwise finds the remainder of her testimony immaterial to the resolution of the pending motion.

[14] The record does not contain any body camera footage of the incident and the parties stipulate that tactical team officers in this district in 2016 did not have body camera equipment.  [324] ¶ 5.

[15] Heading out to pick up her then-husband from work, Ms. King had agreed to give Defendant Turman a ride. [334] at 70.  When Defendant Turman got in the car, she observed him carrying a small package of some kind, but she did not know what it contained.  *Id.* at 70–71.  When Defendant Turman got in the car, he kept the item with him in the backseat.  *Id.* at 71.

car driving behind her. [344] at 72–73. Both officers placed their initial sighting of the Pontiac on 68th Street, driving west towards Bishop. The officers turned on their emergency lights while still driving westbound on 68th Street, at or near the intersection of 68th and Bishop.[16] [344] at 13. The Pontiac, which was also travelling westbound on 68th, turned north onto Bishop to pull over.[17] *Id.* at 14. Officers ultimately curbed the car at or near 6736 South Bishop. [324] ¶ 3.[18]

Wearing badges identifying themselves as police officers, Officer Passamentt approached the passenger side of the vehicle, and Officer Vainisi approached Ms. King in the driver's seat and asked for her license.[19] [344] at 14, 35, 53. When Officer Passamentt approached, he saw Defendant Turman hunched over in the back seat making extreme movements toward the floor panel of the vehicle, as if to conceal something.[20] [344] at 15; [283-1] at 4. From his position standing outside the vehicle

---

[16] Both officers testified that they first saw the car while travelling westbound on West 68th Street between Loomis and Bishop, coming from the east toward the intersection, *see* [344] at 8–10, 47. When asked to show on a map where they first saw the vehicle, the officers indicated slightly different locations on 68th Street, between Loomis and Bishop. *See* [344] at 10; 51. The contemporaneous report indicates that the officers encountered the car while travelling westbound from the intersection of 68th and Bishop. [283-1] at 4. Defendant believes this difference constitutes a material discrepancy or physical impossibility, but the report's summary citation to a location within feet of the officers' recollection fails to undermine the credibility of their testimony as to where, and how, the stop took place.

[17] South Bishop is a southbound, one-way street. [344] at 49. Turning north onto South Bishop, then, meant that the Pontiac—and the officers following—briefly drove the wrong way up a one-way street. The police report did not identify this fact as the traffic violation that give rise to their stop, but the officers' testimony establishes that they initiated the traffic stop before the illegal turn took place, and then made the stop, after the turn, facing northbound on Bishop. *Id.* at 28, 49.

[18] On cross-examination, Defendant asked Ms. King several questions regarding her exact route that night and her routine travel habits, *see* [344] at 84–97, in an apparent effort to cast doubt upon whether police officers, in fact, drove behind the Pontiac that night, ever witnessed a traffic violation, or otherwise testified credibly. Ms. King repeatedly reiterated that she takes different routes depending upon the day and that she cannot remember her route that evening. *See, e.g.* [344] at 88 ("It depends on how the traffic is flowing on if I were to ride up the one-way or if I will keep through so actually I don't recall where I turned or why the police even stopped me or why I was on Bishop at that point right there."). Based upon her lack of memory, the factual record fails to define Ms. King's route prior to her interaction with the police officers on the night in question. Ms. King's testimony presents no credible basis to cast doubt upon the officers' version of events upon seeing the car, and she confirmed that they pulled her over from behind, placing them in a position to see her rear license plate. *See* [344] at 73. Moreover, the parties stipulated to the ultimate location of the traffic stop, [324] ¶3, and all parties involved in the stop itself otherwise place the events at or near the intersection of Loomis and Bishop.

[19] Ms. King testified that the officers did not inform her of the reason for the stop, [344] at 73, but the parties stipulate that the officers issued her a citation for not having a license plate light (the traffic case was later dismissed). *See* [324] ¶ 2.

[20] The officers did not recognize Defendant Turman based on his appearance, and only after conducting a name check did they later learn his identity. [344] at 19, 53. Upon learning it, Officer Vainisi

and equipped with a high illumination LED flashlight, Officer Passamentt looked at the floor where Turman was gesturing and saw, at Defendant Turman's feet, an olive-colored ammunition box with the label "9 mm" written upon the top in large black letters.[21] [344] at 14–16, 35; Gov. Ex. B; Gov. Ex. C. Based upon his training and experience, Officer Passamentt recognized this type of box from his time in the military and he knew that the label referred to ammunition for a "9mm" caliber firearm, [344] at 16, and that the box was also large enough to contain a firearm. *Id.* at 60. With safety concerns in mind, Officer Passamentt immediately warned his partner about the box. *Id.* From the other side of the vehicle, Officer Vainisi also shined his flashlight in and saw the box at Defendant Turman's feet in plain view. *Id.* at 55.

Officer Passamentt inquired about the box, and Defendant Turman immediately replied that it was his toolbox. [344] at 18; [283-1] at 4. Officer Passamentt then asked Defendant Turman if he had a valid Firearm Owners Identification ("FOID") card.[22] [344] at 18 (Officer Passamentt was aware that Illinois law requires individuals to obtain a valid FOID card to lawfully possess a firearm or ammunition). In response to the officer's question, Defendant Turman acknowledged that he did not have a valid FOID card. *Id.*; [283-1] at 4. Officer Passamentt observed that Defendant Turman was nervous during the encounter but compliant throughout. [344] at 18–19.

At that point, the officers removed Defendant Turman from the vehicle and detained him in handcuffs. *Id.* at 19–20. Officer Passamentt seized the ammunition box, opened it, and observed over 100 rounds of different types of ammunition inside it.[23] *Id.* at 19–20, 36. Breana King confirms that around the time, Defendant Turman told the officers that she knew nothing about the box and that it was not hers. [344] at 74–75. After he was in handcuffs, the officers asked her permission to search the vehicle. *Id.* at 75, 78. Breana King granted permission, and the officers searched the vehicle but did not find a firearm. *Id.* at 75.

---

recognized Jolicious Turman's name as that of a gang member affiliated with the Goonie Boss gang. *Id.* at 65–66. But neither officer was personally involved in any ongoing investigations into Defendant Turman or the gang. *Id.* at 23, 60. Similarly, the record indicates that neither officer knew Breana King or recognized the car she drove. *See id.* at 53.

[21] Officer Passamentt remembered this encounter, and the type of ammunition box he saw, because he had never seen one in Chicago before this incident, [325] at 17, but he recognized this type of box from his time in the military. *Id.* That said, he also acknowledged that such boxes are available at Wal-Mart. *Id.* at 37.

[22] The parties stipulate that "Defendant Turman did not have, nor had he been issued, a FOID card or CCL" as of August 3, 2016. [324] ¶ 8.

[23] The parties stipulate that officers recovered 173 rounds of ammunition inside the toolbox. [324] ¶ 7; *see also* [283-1] at 3 (contemporaneous report documenting ammunition recovered).

Based upon the record, the traffic stop began around 10:26 p.m., [324] at 1, and the officers arrested Defendant Turman no more than 5–10 minutes after the initial stop. [344] at 41, 58. After the arrest, the officers requested transport, which arrived about 10 minutes later to take Defendant Turman to the police station. *Id.* at 22, 40. Shortly after Turman's arrest and after they searched the Pontiac, the officers permitted Ms. King to leave, and she estimates that she left the scene around 10:45 p.m. (noting that she made it on time to pick up her then-husband from work at 11:00 p.m. from a location approximately 15 minutes away). [344] at 70, 75-76, 93.

## C. Conclusion of Law

Defendant Turman challenges the lawfulness of the traffic stop and resulting events, arguing that officers' conduct violated the Fourth Amendment's protections against unreasonable searches and seizures. *See* U.S. Const. amend. IV. In particular, Defendant Turman advances three arguments: (1) officers did not have reasonable suspicion to conduct the traffic stop in the first instance; (2) law enforcement unreasonably extended the stop longer than was necessary to deal with the alleged traffic violation; and (3) law enforcement lacked the probable cause necessary to support the search and seizure of the ammunition box in the vehicle. [282]. The Court addresses each, in turn.

### 1. Reasonable Suspicion Existed to Conduct the Traffic Stop

Defendant first argues that the traffic stop, and resulting evidence and arrest, violated the Fourth Amendment, and require suppression. The evidence does not support this conclusion.

The Fourth Amendment protects persons from unreasonable searches and seizures. U.S. Const. amend IV. A traffic stop qualifies as a Fourth Amendment seizure, and thus, the Fourth Amendment requires that the stop by reasonable under the circumstances. *See Whren v. United States*, 517 U.S. 806, 809–10 (1996). But because "traffic stops are typically brief detentions, more akin to *Terry* stops than formal arrests, they require only reasonable suspicion of a traffic violation—not probable cause." *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021), *cert. denied,* 212 L. Ed. 2d 405, 142 S. Ct. 1420 (2022) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *Navarette v. California*, 572 U.S. 393, 396–97 (2014); and *Terry v. Ohio*, 392 U.S. 1 (1968)). Reasonable suspicion exists "when an officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Pace*, 48 F.4th 741, 749 (7th Cir. 2022) (quoting *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020)). Although reasonable suspicion "requires something less than what is necessary to show probable cause, it requires more than a mere 'hunch.'" *Id.* (quoting

*United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999)). *See also United States v. Rodriguez-Escalera*, 884 F.3d 661, 667–68 (7th Cir. 2018).

Witnessing a traffic violation provides reasonable suspicion. *See United States v. Smith*, 32 F.4th 638, 639 (7th Cir. 2022); *United States v. Radford*, 39 F.4th 377 (7th Cir. 2022); *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020). A driving violation can justify a traffic stop, even if the violation is, all things considered, "quite minor." *Smith*, 32 F.4th at 641.

In this case, the officers conducted a lawful traffic stop. Both officers testified that while travelling about twenty feet behind the red Pontiac, they could not read its license plate in the dark, which constitutes a violation of the Chicago Municipal Code. *See* Chicago Municipal Code, § 9-76-050(d) (License plates must be "so lighted that the numbers on said plate shall be plainly legible and intelligible at a distance of 50 feet."). Based upon an obvious traffic code violation, the officers curbed the vehicle.[24] Indeed, the record contains no evidence to controvert officers' testimony that the plate lacked sufficient lighting.

Defendant Turman merely urges the Court to question the officers' credibility generally, based upon their potential subjective motivations for pulling the vehicle over. [282] at 1–4. Given the record, however, the officers' testimony remains credible, and this Court finds no evidence of any unlawful motive for their actions.[25]

---

[24] Additionally, prior to curbing the vehicle, the officers also observed Ms. King turn the wrong direction up a one-way street right after officers initiated their police lights, and once that happened (and before she submitted to their show of authority by pulling her over), the illegal turn provided another legal justification for making the subsequent traffic stop. *United States v. Mays*, 819 F.3d 951, 956 (7th Cir. 2016) (Even when an individual "is confronted with an obvious show of authority,' they are "not seized" until their "freedom of movement is terminated by an application of physical force" or by their "submission to the asserted authority."). The fact that the officers subjectively based their stop on something else is irrelevant. Under well-settled law, if officers possess information supporting a lawful *Terry* stop, then their subjective motivations do not invalidate the seizure because the relevant finding of reasonable suspicion (or probable cause) remains based upon "the facts as they would have appeared to a reasonable person *in the position of the arresting officer*—seeing what he saw, hearing what he heard." *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010); *Whren*, 517 U.S. at 813 (1996) ("We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved."); *Ohio v. Robinette*, 519 U.S. 33, 38 (1996) ("As we made clear in *Whren*, 'the fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'").

[25] Indeed, the record flatly belies any suggestion of any illegal profiling in general, or any other unlawful motive connected to Defendant Turman in particular. Among other factors, both officers credibly testified that they did not know Defendant Turman was in the vehicle when they pulled it over, and that they were not assigned to any investigations involving him. Nevertheless, Defendant Turman suggests that the officers' role as proactive, tactical team officers makes it unlikely that they would be concerned with minor traffic violations, and thus, the officers' version of events remains *so unbelievable* that the Court should question their credibility about existence of a traffic violation at

Regardless, "subjective motivations of the agents are irrelevant to the Fourth Amendment analysis." *United States v. Taylor*, 596 F.3d 373, 378 (7th Cir. 2010); *see also Wren*, 517 U.S. at 811 (rejecting the notion that "an officer's motive invalidates objectively justifiable behavior"). In *United States v. Watson*, the Seventh Circuit upheld a traffic stop where a rear license plate was not illuminated because "the police did not stop the car until they observed a violation," and any evidence of an investigative pretext was "of no moment." 558 F.3d 702, 704 (7th Cir. 2009). As in *Watson*, this Court credits the officers' testimony regarding the violation they observed, and Defendant Turman's speculation as to the "real reason" the officers pulled over the Pontiac is, similarly, "of no moment."

Finding their testimony credible, this Court concludes that the officers had reasonable suspicion to justify the initial traffic stop, and thus the initial stop complied with the Fourth Amendment.

### 2.    Law Authorized the Search and Seizure of the Ammunition Box

Next, Defendant Turman challenges the lawfulness of officers' search and seizure of the ammunition box.

First, the Government argues that Defendant Turman lacks standing on this point because he did not own the red Pontiac, and thus, he has no Fourth Amendment right against searching it or its contents. This argument fails.

The Fourth Amendment right against unreasonable searches only applies to those places or things over which a person has a "legitimate expectation of privacy." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). Here, Defendant Turman does not contest the officers' search of Ms. King's red Pontiac, but merely of the ammunition box. While the Seventh Circuit has not spoken explicitly to the question, numerous courts have held that a passenger does not lose his expectation of privacy in a bag, backpack, luggage, and the like simply because he carries them into another person's vehicle. *See, e.g. United States v. Barber*, 777 F.3d 1303, 1305 (11th Cir. 2015) ("Barber had standing to challenge the search of his bag, even if he lacked standing to contest the search of the car."); *United States v. Iraheta*, 764 F.3d 455, 462 (5th Cir. 2014) ("We have recognized that passengers have standing to challenge searches to their luggage."); *United States v. Cade*, No. 1:21-cr-00223, 2021 WL 4805418 (N.D. Ill. Oct. 13, 2021) (recognizing, in dicta, that the "general rule is that a person has no reasonable expectation of privacy in an automobile belonging to another. There are some exceptions to that rule, especially for the personal belongings of passengers in a vehicle." (internal citations

---

all. The Court rejects this reasoning, however, finding it more than credible that vigilant observation of traffic stops would, and did, form a normal and lawful part of the officers' proactive policing strategy in a high crime area.

omitted). In this case, Defendant Turman sat with the box between his feet and told officers that it was his box. The Court is satisfied that Defendant Turman possessed sufficient standing to contest the search of the ammunition box.[26]

Beyond the standing issue, the Government argues that the search complied with the Fourth Amendment. The Court agrees. Based upon the facts presented at the hearing and as detailed below, the record shows that the officers had authority to conduct a protective sweep and probable cause to search the ammunition box.[27]

First, under well-settled law, the officers possessed the authority to search the ammunition box—and any other area inside the car where weapons might have been hidden—as part of a protective sweep. As the Supreme Court held in *Michigan v. Long*:

> The search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

463 U.S. 1032, 1049 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Clearly, based upon their plain view observations, the record more than meets this standard. The ammunition box sat in plain view at Defendant's feet with the word "9mm" written in large black letters. Combining this observation with the setting of the traffic stop in a high violent crime area at night, and Defendant's furtive movements to conceal something, Officer Passamentt reasonably became concerned about safety and the potential presence of firearms. At the hearing, his memory was crystal clear: as he approached the vehicle, he saw Defendant Turman gesture toward his feet to hide something, so he looked into the car with his flashlight to see what Turman was doing, and an ammunition box at Turman's feet immediately caught his eye. [344] at 15–16. From where he stood, Officer Passamentt not only recognized the green army box as an ammunition box from his training and experience, but he also saw the words "9mm" written on the lid (which he knew to be a shorthand reference to 9-millimeter caliber firearms and ammunition); and the box itself was large enough to not only contain ammunition, but a handgun as well. *Id.* Immediately upon seeing the ammunition box, Officer Passamentt asked Defendant Turman what it was, and in response, Defendant Turman appeared nervous and replied that it was his toolbox.

---

[26] Even if some ambiguity regarding standing remained, however, the result here does not change, because Defendant's challenge still fails on the merits.

[27] Finding more than one lawful justification for officers' actions as to the ammunition box, this Court need not address the legal question of evitable discovery, or what impact Ms. King's voluntary consent to search her vehicle had upon the lawfulness of search of the toolbox in the back seat.

Officer Passamentt then asked whether Turman had a valid FOID card, and Defendant Turman admitted that he did not. This is more than enough to deny Defendant Turman's motion to suppress.[28]

Further, given the objectively reasonable safety concerns, the subsequent protective search, and the temporary detention of Defendant Turman in handcuffs to perform it, both remained lawful. *United States v. Howard*, 729 F.3d 655, 661 (7th Cir. 2013) (use of handcuffs remains constitutional during a *Terry* stop "where police officers can point to specific reasons for believing that handcuffing the particular person during the stop was needed for safety or to prevent flight."); *United States v. Stewart,* 388 F.3d 1079, 1084–85 (7th Cir.2004) (approving handcuffing and seating person suspected of armed bank robbery in back of police car); *United States v. Smith,* 3 F.3d 1088, 1095–96 (7th Cir.1993) (approving handcuffing persons suspected of drug trafficking where officer based action on safety concerns, the time of night, the general environment, and the nature of the offenses).

Upon opening the box, the officers found 173 rounds of ammunition, *see* [324] ¶ 7. This, in turn, constituted probable cause to arrest Defendant Turman based upon his possession of the box and his admission that he did not have a FOID card.[29]

---

[28] Defendant Turman argues that the authority to conduct a protective sweep pursuant to *Long* cannot apply once the officers detain the person that they suspect of being armed, because detention minimized any risk that the individual could gain "immediate control" of weapons. Not so. Under controlling case law, the safety risk continues with the presence of unsecured firearms at the scene, even if certain individuals have been detained. *See United States v. Vaccaro*, 915 F.3d 431, 437 (7th Cir. 2019) (holding that during a *Terry* stop, the possibility of a defendant regaining access to weapons remains even if the defendant is temporarily restrained); *Long*, 463 U.S. at 1050 ("Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile. In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside. Or, as here, the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons.") (internal quotations and citations omitted). Therefore, despite Defendant Turman's amateur assessments of the safety of leaving potential firearms unsecured, the officers were, in fact, permitted to conduct a protective sweep of the vehicle and any areas within it—including the box—that might have concealed a weapon for their own safety and the safety of everyone in the immediate area (which included the presence of other uncuffed individuals on scene).

[29] Defendant Turman does not dispute the existence of probable cause to arrest at this point, nor could he with this factual record. Without a valid FOID card, it is unlawful to possess ammunition—or a firearm—in Illinois. *See* 430 Ill. Comp. Stat. 65/2(a)(2) ("No person may acquire or possess firearm ammunition within this State without having in his or her possession a Firearm Owner's Identification Card previously issued in his or her name by the Illinois State Police under the provisions of this Act."). As such, the recovery of the ammunition and the resulting probable cause arrest of Defendant Turman present no other issues. *United States v. Shoals*, 478 F.3d 850, 852–53 (7th Cir. 2007) ("If, as the district court held, the [ammunition was] discovered during a stop-and-frisk authorized by *Terry,* then the officers were free at that point to make a custodial arrest" and the defendant's "admission" making possession of the ammunition unlawful "provided probable cause to arrest him for possessing

In the alternative, beyond application of the protective sweep doctrine, the officers also possessed probable cause to conduct a search and seizure of the ammunition box based upon the totality of circumstances. *See United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014) (holding that under the automobile exception to the warrant requirement, police may conduct a warrantless search of an automobile if they have probable cause to believe the vehicle contains evidence of criminal activity); *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010) ("Probable cause to search exists where, based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched."); *Arizona v. Gant*, 556 U.S. 332, 347 (2009) (holding a search may extend to "any area of the vehicle in which the evidence might be found."). In this case, *prior to either the search itself or Defendant Turman's formal arrest*, the officers had sufficient reason to believe that the box he possessed contained contraband. As noted above, the nature of the "9mm" box was apparent in plain view and Defendant Turman possessed it without a FOID card, per his own admission. *See United States v. McGill*, 8 F.4th 617, 622 (7th Cir. 2021) (an officer must have "probable cause to believe that the item is contraband or otherwise linked to criminal activity"); *United States v. Raney*, 342 F.3d 551, 558 (7th Cir. 2003). Once again, the law is satisfied.

### 3.    The Scope and Duration of the Stop Remained Lawful

Lastly, Defendant Turman argues that the course of events that led to his arrest violated the Fourth Amendment because officers "unnecessarily extended the stop longer than necessary to deal with the original reason for the stop." [282] at 5. The Government responds that "the traffic stop lasted no longer than its mission justified." [309] at 9.

The Fourth Amendment does not provide a strict or exact time frame that a *Terry* stop may last. *See United States v. Gholston*, 1 F.4th 492, 496 (7th Cir. 2021) ("While officers must act diligently, we repeatedly have declined to adopt a rule of thumb that relies on the number of minutes any given stop lasts."); *United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018) ("The question does not depend on exactly how many minutes the stop lasts. It depends on whether law enforcement has detained the person longer than needed to carry out the investigation that was justified by the reasonable suspicion."). Moreover, even though a stop might become unlawful if it is "prolonged beyond the time reasonably required to complete the mission," the "mission" itself may include not only the violation that warranted the stop, but also attending to related safety concerns. *United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019); *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). Thus, without question, an officer conducting a valid traffic stop "can detain the occupants of the vehicle long enough to accomplish the purpose of the stop," and, "as part of the

---

ammunition.").

24

stop, police may ask the vehicle's occupants 'a moderate number of questions' and request their identification." *United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)); *United States v. Moore*, 375 F.3d 580, 582 (7th Cir. 2002) (questioning of passengers remains a lawful part of a traffic stop).

Here, the record contains no indication that law enforcement exceeded the permissible scope of the traffic stop. The credible testimony of both officers and Ms. King estimated that the total time of the traffic stop, from the moment the officers turned on their lights to the time Defendant Turman was formally arrested, lasted at most ten minutes. Given the safety concerns immediately raised by Defendant Turman during the stop, the officers did not unreasonably prolong the encounter. *Rodriguez*, 575 U.S. at 354. Clearly, the officers' mission included the time need to attend to related safety concerns. *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (Emphasizing the inherent dangers of routine traffic stops, the Court noted that "a significant percentage of murders of police officers" occur when "the officers are making traffic stops.").

Likewise, as the Supreme Court held in *Rodriguez*, reasonable suspicion of additional criminal activity—beyond the initial traffic violation—can also justify the extension of a traffic stop. 575 U.S. at 355. Such is the case here, where within moments of approaching the vehicle, law enforcement not only needed to make the scene safe by securing potential firearms, but they also possessed reasonable suspicion that Defendant Turman had committed an ammunition—if not firearms—offense. In fact, as discussed above, they possessed probable cause to believe that Defendant Turman had committed a felony ammunition offense.

For the reasons explained, this Court denies Defendant Turman's motion to suppress [282].

## IV. Defendant Turman's Motion to Suppress Statements Made to Law Enforcement on August 3, 2016, [286]

Next, Defendant Turman seeks to suppress the statements he made to Officer Passamentt during his August 3, 2016 arrest on Fifth Amendment grounds. Specifically, Defendant Turman seeks to suppress his comment that the box at his feet was a toolbox, and his response to Officer Passamentt's inquiry as to whether he had a valid Firearm Owner's Identification ("FOID") card. He argues that Officer Passamentt should have given him *Miranda* warnings before inquiring about the ammunition box or FOID card, and that in the absence of such warnings, the officer's questioning violated his Fifth Amendment right against self-incrimination. [286]. He also argues that this Fifth Amendment violation requires that this Court quash his resulting arrest as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471 (1963).

The Government responds that no custodial interrogation took place and thus that *Miranda* was not triggered. [309]. In the alternative, the Government argues that the questioning falls into the public safety exception to *Miranda*. *Id.*

Relying on the factual findings above relating to the traffic stop and resulting arrest, *see supra* § V(A), this Court proceeds directly to its conclusions of law.

## A.    Conclusion of Law

The Supreme Court's *Miranda* jurisprudence requires officers to provide *Miranda* warnings as a safeguard against law enforcement coercion during custodial interrogation. *See Vega v. Tekoh*, 142 S. Ct. 2095 (2022) (describing the development of the Supreme Court's *Miranda* jurisprudence and the prophylactic functions of the *Miranda* rule); *Miranda v. Arizona*, 384 U.S. 436 (1966).

It is well settled that in the ordinary course of events, "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) (internal citations omitted); *Berkemer v. McCarty*, 468 U.S. 420 (1984). The rule is not categorical, however, and courts acknowledge that there may be nuance in a particular factual circumstance. *See Berkemer*, 468 U.S. at 440 ("If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*."). To determine whether a particular traffic stop diverges from the general rule, courts ask "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Shatzer*, 559 U.S. at 112 (internal citations omitted).

The factual record here presents no indicia of formal arrest at the point when Defendant Turman made the challenged statements to law enforcement. Although the officers were armed, neither drew their weapons, and they questioned Defendant Turman while he still sat in the backseat of Breana King's car. Defendant Turman's only argument on this point is that "the officer was standing in front of the rear passenger door making it impossible for Mr. Turman[] to exit and leave, thus depriving him his freedom of action in a significant way." [286] at 4. This, alone, cannot turn a traffic stop into the restraint associated with formal arrest under the law. Taken to its logical conclusion, Defendant Turman's frivolous argument would require *Miranda* warnings in every traffic stop—a rule the Supreme Court rejected as "unacceptable" in *Berkemer*. 468 U.S. at 441. This is not a close case: nothing in the record triggers a finding of custodial interrogation or the need for *Miranda* warnings.[30]

---

[30] Likewise, the nature of the officer's inquiry also falls squarely within the public safety exception to the *Miranda* requirements, which allows police officers to question a suspect without first giving

For the reasons explained, this Court denies Defendant Turman's motion to suppress, [286].

## V. Defendant Turman's Motion to Suppress Suggestive Identifications, [289]

Lastly, Defendant Turman's moves to suppress a witness' identification of him as an impermissible suggestive identification and an improper lay opinion. [289]. Specifically, Defendant Turman challenges the procedures law enforcement employed when obtaining an identification of him from a witness, Brittany King, and seeks to bar the Government from offering evidence and testimony related to Brittany King's identification of Defendant Turman in a video-recording the Government intends to admit at trial.

Pursuant to this motion, the Court conducted an evidentiary hearing on March 23, 2023. [419]. The Government presented two witnesses: Detective Henry Barsch and Brittany King. *Id.* In addition, Defendant submitted the following exhibits: Ex. A, Brittany King's electronically recorded interview, [290-1]; Ex. B, the Chicago Police Department case supplementary report, [290-2]; Ex. C, Brittany King's grand jury testimony, [290-3]; Ex. D, Brittany King's photo advisory form, photo arrays, and surveillance stills, [290-4]; Ex. E, the surveillance video, [290-5]; Ex. F, Breana King's electronically recorded interview, [290-6]; and demonstrative Ex. G, a draft transcript of Breana King's recorded interview. Based upon the evidence, including the credible testimony of Detective Barsch and Brittany King,[31] which were both corroborated by the documents and exhibits in the record, the Court makes the following factual findings and draws the resulting conclusions of law.

### A. Findings of Fact

On June 20, 2016, at around 5:00 p.m., Brittany King arrived at a Father's Day barbecue at her sister Breana King's home on South Bishop Street in the Englewood neighborhood of Chicago. [419] at 35. At the time, Breana King was married to Lamarr Isaac. *Id.* at 36; 66. At the barbecue, Brittany King was introduced to "JoJo," a man she had seen on multiple occasions when visiting her sister but had never formally met. *Id.* at 36. Brittany now knows JoJo to be Defendant Jolicious Turman. *Id.* at 57. At the barbecue, Defendant Turman brought a dog, and Brittany King had

---

*Miranda* warnings if they reasonably believe the questions are "necessary to secure their own safety or the safety of the public." *New York v. Quarles*, 467 U.S. 649, 655–57, 659 (1984); *see also United States v. Hernandez*, 751 F.3d 538, 540 (7th Cir. 2014) (same).

[31] Brittany King's testimony at the hearing regarding the events of June 20, 2016 remained consistent with the police report recounting her August 17, 2017 statements to police, [290-2] at 10–11, as well as with her August 17, 2017 recorded interview, [290-6], and her prior grand jury testimony, [290-3].

the opportunity to observe Defendant Turman (and the dog) over the course of several hours, talking and drinking with him and others.  *Id.* at 36; 66.

Later in the evening, Brittany King, her friend Mary Gaither, and her brother-in-law, Lamarr Isaac, walked from the residence to a nearby liquor store at 69th and Ashland.  *Id.* at 37.  All three entered the store, but Mr. Isaac exited without Brittany King or Ms. Gaither realizing he left.  *Id.*  The women were laughing and joking with a man they met inside: Ramal Hicks.  *Id.* at 37–38.  When Brittany King and Ms. Gaither realized that Mr. Isaac had left the store, they went to follow him.  *Id.*  Ramal Hicks left the store too, shortly thereafter.  As the women walked back toward Bishop Street, Mr. Isaac approached them, now part of a group of people (including Defendant Turman) who then surrounded Ramal Hicks.  *Id.*  Brittany King saw Mr. Isaac hit Mr. Hicks, and moments later she heard gunshots but, because she was intoxicated and looking in a different direction, she did not see the shooter as the shots rang out.  *Id.* at 38; 40.

Brittany King immediately began to run from the scene, but when she looked back and realized someone had been shot, she returned to render assistance.  Mr. Hicks had been shot.  Brittany King called 911 while Ms. Gaither went into the liquor store to get some water for Mr. Hicks.  *Id.* at 38.  When the police arrived, Brittany King did not speak to them but instead returned to her sister's house where her car was parked, intending to head home for the night.  *Id.* at 39.  Back on Bishop Street, she encountered her brother-in-law and Defendant Turman again.  *Id.*  They approached her and demanded to know what she had told the police.  *Id.*  She told them she had not said anything.  *Id.*  In recounting this interaction at the hearing, Ms. King's tone and mannerisms clearly expressed that this confrontation served to intimidate her and keep her silent.  In the days following the shooting, Brittany King learned that Mr. Hicks had died.  *Id.* at 62.  But because she was scared, Brittany King did not speak to law enforcement for approximately one year.  *Id.* at 40.

On August 17, 2017, law enforcement agents investigating the murder interviewed Brittany's sister, Breana King, about the events of June 20, 2016.  *Id.* at 40; [290–1].  From the interview room, Breana King called Brittany King and asked her to come to the station and speak to the police about the night of Ramal Hicks' death.  [419] at 8; [290-1].

Brittany King went to the Area South Detective Division where she spoke with Detectives Barsch and Arteaga in an initial interview and told them she did not see who shot Ramal Hicks.  [419] at 13.  Next, an independent administrator—a detective with no background in the case and no knowledge of the subjects—presented a series of photo arrays to Brittany.  *Id.* at 9; 17; [290-4] (documentation of photo arrays).  Out of six arrays, she identified three people: (1) Lamarr Isaac; (2) "JoJo"; and (3) a third man whose name she did not know but who she had seen in the neighborhood on the night of the shooting.  At bottom of the photo array in which she identified Defendant

Turman, Ms. King wrote a handwritten note which states: "That is JoJo. The night in question JoJo walked back up with LaMarr, not sure who shot but he was present." [290-4] at 5. There is no indication in the record that Ms. King faced any pressure to reach any of these identifications.

After the photo arrays, Detectives Arteaga and Barsch showed Brittany King a surveillance video from the liquor store depicting the shooting. [419] at 10; [290-5] (surveillance video). While events in the foreground of the video are clear, albeit in black-in-white, the shooting itself takes place in the background, where the image is blurry and pixelated. More specifically, while possible to make out certain details— a person in a white t-shirt; someone else in shorts; a person with a dog; someone pointing a gun; someone falling to the ground—it is difficult to make out the people gathered, and facial features remain totally indiscernible. Nonetheless, Brittany King watched it and then told officers that "JoJo" was the shooter. Both the detectives, and Brittany King herself, confirmed that no one pressured her to reach this opinion or suggest to her in any way the identity of the shooter. *See* [419] at 10; 12; 62.

In accordance with Brittany King's preferences (and consistent with consent requirements under state law), the police did not videotape or audiotape the initial interview, or when Ms. King viewed the photo arrays and surveillance video. [419] at 11. After these three events took place, however, Brittany King consented to a video recording to memorialize the interview. *Id.*; [290-6] (interview recording). In the recording, the officers went over the events of the evening with her and asked her questions, including asking her to identify the gunman. [419] at 11. Again, she identified "JoJo" as the shooter. At the hearing, Brittany King explicitly confirmed that she faced no pressure from law enforcement to identify Defendant Turman or anyone else. *See id.* at 47.

On June 14, 2018, after another year had passed, Brittany King testified before the grand jury about her prior identification of Defendant Turman. *See* [290-3]. As part of a series of questions about the photo arrays, she was asked "Did you pick out JoJo as the individual that actually shot?" She responded "Yes." *Id.* at 17.[32]

During the evidentiary hearing for this motion on March 23, 2023, Brittany King again viewed the video recording. [419] at 71. At first, counsel played the video at a fast pace and Ms. King was unable to identify the individuals on the video. *Id.* at 72. After counsel played the video at 0.5 speed, however, Ms. King used her prior

---

[32] At the motion hearing, Defendant Turman highlighted a perceived inconsistency in Brittany King's testimony, noting that Ms. King did not, in fact, identify the shooter during the photo array. *See* [419] at 63–63. Given that the question posed in the Grand Jury did not refer to her knowledge at a specific point in time, however, the record does not undermine Ms. King's accuracy and veracity. While there are certain things she cannot recall, the version of the events she does recall has remained consistent and credible over time.

personal observations to identify persons in the video, including herself, her brother-in-law (who was wearing a white shirt), and Defendant Turman (who was accompanied by his dog). As before, she again stated that she did not personally see the shooter as the shots were fired. *Id.* at 72–74.

## B.     Conclusion of Law

The Government seeks to introduce into evidence Brittany King's identification of Defendant Turman and opinion that "JoJo" was the shooter. Defendant Turman challenges the admissibility of the opinion that "JoJo was the shooter" both as a matter of due process and under Federal Rule of Evidence 701. [289].

### 1.     Absence of Any Due Process Violation

The Supreme Court has recognized "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as a perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 231 (2012). As the Seventh Circuit explained in *United States v. Sanders*, the *Perry* case sets forth a two-prong approach to determining whether identification procedures violate due process. *Sanders*, 708 F.3d 976, 983–84 (7th Cir. 2013) *cert. denied*, 134 S. Ct. 803, 187 (2013). First, a court considers whether the identification procedure that law enforcement used was "both suggestive and unnecessary." *Id.* (citing *Perry*, 132 S. Ct. at 724). Second, a court looks to the "totality of the circumstances" to determine whether "other indicia of reliability" outweigh the "corrupting effect of law enforcement suggestion." *Id.* (citing *Perry*, 132 S. Ct. at 725). A court only considers the second prong if the defendant establishes the first prong. *Id.*

In briefing, Defendant Turman argues that law enforcement used unduly suggestive identification procedures and compares the procedures to a "show-up," suggesting it was improper for law enforcement to show Brittany King the photo arrays before asking her to watch the video. [289] at 7-8. The record, however, contains no basis in fact or law for this position, and indeed, Defendant Turman conceded at argument that the photo array procedure was not suggestive based upon the evidence adduced at the hearing. Moreover, the witness here possessed an independent basis to know Defendant Turman's appearance, so the timing of the photo arrays had no bearing upon her ability to identify photographs of Defendant Turman or otherwise distinguish between individuals depicted in the video.

Nonetheless, Defendant Turman suggests that law enforcement showed Ms. King the video in a suggestive way. Once again, nothing in the record bears this out: there is no evidence that law enforcement made improper comments or otherwise

30

pressured Ms. King into identifying Defendant Turman as the shooter.[33]  In fact, Ms. King testified that she believed officers did not have any sense of who the shooter was, nor did they assist her in determining the identities of those depicted in the video.  *See* [419] at 62.  Thus, Defendant has not identified "improper state conduct" sufficient to trigger the second prong of *Sanders* inquiry.  *See Sanders*, 708 F.3d at 984; *United States v. Redwood*, No. 16-cr-80, 2016 WL 4245531 at *10–12 (N.D. Ill. Aug. 11, 2016).

### 2.    Testimony Admissible Only in Part Under Rule 701

Defendant Turman also argues that Brittany King's testimony that "JoJo was the shooter" constitutes improper lay opinion testimony under Rule 701.  The rule states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> > (a) rationally based on the witness's perception;
> > (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> > (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Rule 701's requirement that lay witnesses base opinions upon their perception derives from the personal knowledge standard of Federal Rule of Evidence 602.  *See Von der Ruhr v. Immtech Intern., Inc.*, 570 F.3d 858, 864-65 (7th Cir. 2009) (finding that an individual does not have first-hand knowledge of an event she did not personally witness).  Much of Ms. King's potential testimony straightforwardly meets this personal knowledge requirement, including her testimony about her observations on the night of Ramal Hicks' murder; her interactions with Defendant Turman; what she saw and heard before, during, and after the shooting; and her conversation with Defendant Turman and Lamarr Isaac afterward.[34]  She also has personal knowledge of various events depicted in the videotape, including: (1) her walking with her friend Mary Gaither; (2) Lamarr Isaac hitting Mr. Hicks; and (3) the arrival of the person she knew as "JoJo" (Defendant Turman) with a dog.  As such, even Defendant Turman does not challenge Brittany King's ability to testify about events she observed or to identify him in general.  Instead, he challenges her

---

[33] Defendant notes the fast pace of the memorialization interview and argues that this indicates suggestiveness.  But Detective Barsch testified that the videotaped interview was merely a recap of Ms. King's prior observations throughout the evening, *see* [419] at 11, and thus the recap does not reflect how officers asked her questions in the first instance.  For this reason, the Court finds that the officers' use of any leading questions in the recap video does not undermine Detective Barsch's—or Ms. King's—testimony that no one pressured her to reach the identification.

[34] Indeed, most of this testimony constitutes factual observations, not lay opinion.

identification of the shooter under Rule 701(a) because, before viewing the surveillance footage, she did not know the identity of the shooter.[35]

The Government, on the other hand, posits that Ms. King's opinion as to the identity of the shooter remains admissible under Rule 701(a) because Ms. King has personal knowledge of: (1) what Defendant Turman looked like that night; (2) the scene depicted in the surveillance video (though not the moment of the shooting); and (3) other events in the video. According to the Government, these personal bases of knowledge converge to permit Ms. King to identify Defendant Turman as the shooter in the video.

Here, Rule 701 permits Ms. King to testify, based upon personal knowledge, about those portions of the events depicted in the video that she actually observed. These portions of her testimony are not in dispute, and remain admissible.

In addition, pursuant to Rule 701, courts also routinely admit lay opinion testimony concerning identity, even where the witness lacks personal knowledge regarding the event depicted. *See United States v. Towns*, 913 F.2d 434, 445 (7th Cir. 1990) ("Generally, a lay witness may testify regarding the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.") (internal quotations and citations omitted); *United States v. Jackman*, 28 F.3d 1 (1st Cir. 1995) (holding that lay opinion testimony "identifying a defendant from surveillance photographs" is admissible, "at least when the witnesses possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification."). In other words, if a surveillance video depicts an individual, Rule 701 generally permits a person familiar with the defendant to look at the features depicted in the video of sufficient quality and, based upon his or her personal knowledge of the defendant's appearance, identify the person depicted as the defendant.

Applying those principles here, if the video permitted Ms. King to observe discernable features of the shooter then, based upon her preexisting knowledge of Defendant Turman's appearance generally (and on that night), she could testify that the person pointing a gun in the video is, in fact, Defendant Turman. But as discussed above, the video quality is poor, the camera is positioned far from the events, and it is impossible to discern from the video any features beyond the most generic identifiers. Ms. King gave no indication at the hearing that she was able to identify Turman based on characteristics discernable in the video. Thus, an identification of Defendant Turman as the shooter based solely on her viewing of the video remains

---

[35] Defendant does not otherwise call into question that such testimony, if reliable, would be helpful to the jury under 701(b).

inappropriate here, and leaves the witness no better suited to reach her ultimate conclusion than the jury, because such an identification would necessarily rely not upon personal knowledge but rather upon deductive reasoning (e.g., "Isaac wore white, but the shooter wore a dark color, so Isaac must not have been the shooter.").

Ms. King, who was present and observed many of the events depicted in person, can orient the jury to the events or individuals she observed at the scene based on facts within her personal knowledge. She can also provide the jury with the details she recalls from the evening in question and can point those details out in the video where she sees them. The witness remains free to testify about what she sees in the video, including whether she sees herself, LaMarr Isaac, Defendant Turman, Turman's dog, or anyone else she may be able to identify based on her observations on scene. The Government also remains free to bring in evidence of her previous identification of Defendant Turman as someone she recognizes in the video. Ultimately, however, given the poor video quality, Ms. King cannot testify about events depicted in the background of the video that she did not personally observe. Conclusions about those events must be left to the jury. Thus, the Government must not seek to admit her current or prior opinions on the ultimate question of whether Defendant Turman, in fact, shot Hicks.[36]

### 3.    Testimony Admissible Only in Part Under Rule 403

Based upon the record, this Court also excludes Brittany King's opinion that Defendant Turman was, in fact, the shooter pursuant to Federal Rule of Evidence 403. Under this rule, a Court may exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Here, if Ms. King testifies to the effect that "JoJo was the gunman," the jury may incorrectly conclude that Ms. King actually saw the gunman as the shots were fired, given her presence at the scene. This risk is heightened given the pixelated quality of the video and the distance of the camera from the events. In other words, given her lack of personal knowledge of who fired the weapon despite her presence on the scene, it would unfairly prejudice Defendant Turman to admit her lay opinion as to the shooter's identity. Thus, the Court excludes her conclusion under Rule 403.

For the reasons explained, this Court grants, in part, Defendant Jolicious Turman's motion to suppress, [289]. Based upon the current record, the Government may offer Brittany King's testimony (and related exhibits and evidence) of her identifications and recollection of events based upon personal knowledge, including

---

[36] The Government relies upon *United States v. Redwood*, 2016 WL 4245531, to support its position. That case also involved witnesses viewing video footage, but it remains inapposite because the court found that the witnesses therein had independent knowledge of the contents of the video at issue, despite one parties' arguments to the contrary. *Id.* at *13.

identifying photographs of persons she knows and events depicted in the video recording that she personally observed, but she may not offer her lay opinion testimony that Defendant Turman was, in fact, the shooter in the video recording because she did not personally observe the shooter as he fired and the quality of the video does not otherwise permit her to make an admissible identification of the shooter from such video under Rules 701 or 403. In closing argument, however, the Government remains free to argue all reasonable inferences based upon all of the evidence admitted at trial, including what factual conclusions the jury should make as to the identity of the shooter in the video recording of Mr. Hick's murder.

## VI.    Summary of Rulings

Consistent with its findings of fact and conclusion of law, this Court rules as set forth above: (1) Defendant Jolicious Turman's motion to suppress statements elicited by the Government's jailhouse informant, [284], is denied; (2) Defendant Romeo Blackman's motion to suppress statements made to a cooperating individual, [248], is denied; (3) Defendant Jolicious Turman's motions to suppress all evidence relating to an August 3, 2016 traffic stop, [282], is denied; (4) Defendant Jolicious Turman's motions to suppress statements made to law enforcement on August 3, 2016, [286], is denied; and (5) Defendant Jolicious Turman's motion to suppress suggestive identifications, [289], is granted in part.

Date:  May 10, 2023

ENTERED:

John Robert Blakey
United States District Judge

34